**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joel D. Smith (State Bar No. 244902)
Yeremey O. Krivoshey (State Bar No. 295032)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com
        jsmith@bursor.com
        ykrivoshey@bursor.com

**NATHAN & ASSOCIATES, APC**
Reuben D. Nathan (State Bar No. 208436)
600 W. Broadway, Suite 700
San Diego, California 92101
Telephone; (619)272-7014
Facsimile: (619)330-1819
E-Mail: rnathan@nathanlawpractice.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ANDREW GASSER, NORIKO IKEDA, and MELINDA KELLY, on behalf of themselves and all others similarly situated,<br><br>                         Plaintiffs,<br>        v.<br><br>KISS MY FACE LLC,<br><br>                         Defendant. | Case No.  3:17-cv-01675-JSC<br><br>**PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF OPPOSITION TO DEFENDANT'S MOTION FOR STAY**<br><br>Date:   August 24, 2017<br>Time:  9:00 a.m.<br>Court: Courtroom No. F, 15th floor |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that Plaintiffs Andrew Gasser, Noriko Ikeda, and Melinda Kelly hereby respectfully request that the Court take judicial notice of the documents set forth below (together with their contents) pursuant to Federal Rule of Evidence 201. Rule 201(b)(2) permits a court to take judicial notice of facts that are "not subject to reasonable dispute because [they] . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b)(2). Accordingly, Plaintiffs respectfully request that the Court take judicial notice of the following documents cited in their Opposition to Defendant's Motion For Stay:

1.   **Federal Register**: Use of the Term "Natural" in the Labeling of Human Food Products, 80 Fed. Reg. 69905 (Nov. 12, 2015) ("Request for Comments"). A true and correct copy of this document is attached as Exhibit 1 to this Request for Judicial Notice.

Judicial notice of the Federal Register is required under 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed . . . ."). *See also Rohnert Park Citizens to Enforce CEQA v. U.S. Dept. of Transp.*, 2009 WL 595384, at *3 (N.D. Cal 2009) ("The Federal Register is a paradigmatic case of FRE 201(b)(2), as its accuracy is unimpeachable . . . .").

2.   **District Court Orders**: Plaintiffs ask the Court to take judicial notice of the following four district court orders:

   a.   *Astiana v. Hain Celestial Grp.*, N.D. Cal. Case No. 11-cv-6342, Order Granting Motion to Stay, October 9, 2015 (Dkt. No. 114). A true and correct copy of this document is attached as Exhibit 2 to this Request for Judicial Notice.

   b.   *Barnes v. Campbell Soup Co.*, N.D. Cal. Case No. 3:12-cv-05185, Order Lifting Stay after receipt of the Jan. 6, 2014 FDA Letter, (Dkt. No. 58). A true and correct copy of this document is attached as Exhibit 3 to this Request for Judicial Notice.

   c.   *Cox v. Gruma Corp.*, N.D. Cal. Case No. 4:12-cv-06502, Order Lifting Stay after receipt of the Jan. 6, 2014 FDA Letter (Dkt. No. 71). A true and correct copy of this document is attached as Exhibit 4 to this Request for Judicial Notice.

d. *In re Gen. Mills, Inc. Kix Cereal Litig.*, D.N.J Case No. 2:12-cv-00249, Order Lifting Stay after receipt of the Jan. 6, 2014 FDA Letter (Dkt. No. 98). A true and correct copy of this document is attached as <u>Exhibit 5</u> to this Request for Judicial Notice.

Courts will take judicial notice of the dockets and records of other cases. *E.g.*, *Headwaters Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1051 n. 3 (9th Cir. 2005) (taking judicial notice of a docket of another court); *Jacobson v. Schwarzenegger*, 357 F. Supp. 2d 1198, 1207 (C.D. Cal. 2003) (the "court may take judicial notice of court records") (citing *Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1998)).

**3.    FDA Website Publication**:  Food and Drug Administration ("FDA"), Small Business & Homemade Cosmetics:  Fact Sheet.  A true and correct copy of this document is attached as <u>Exhibit 6</u> to this Request for Judicial Notice and also is available on the FDA's website at http://www.fda.gov/Cosmetics/ ResourcesForYou/Industry/ ucm388736.htm (last visited July 11, 2017).

Government agency websites, and the information contained therein, are matters of public record appropriate for judicial notice under Rule 201.  *See, e.g.*, *Molina v. Wash. Mut. Bank*, 2010 WL 431439 at *3 (S.D. Cal. Jan. 29, 2010) ("Information on government agency websites has often been treated as properly subject to judicial notice"); *see also Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 952 n.2 (9th Cir. 2009) (taking judicial notice of consumer fact sheet on FCC website).

**4.    FDA Correspondence**:  Plaintiffs ask the Court to take judicial notice of the following official letters from the FDA:

a.  March 7, 2013 Letter from FDA to Joseph N. Kravek, Jr.  A true and correct copy of this document is attached as <u>Exhibit 7</u> to this Request for Judicial Notice.

b.  January 6, 2014 Letter from FDA to Judges Gonzalez Rogers, White and McNulty.  A true and correct copy of this document is attached as <u>Exhibit 8</u> to this Request for Judicial Notice.

Official letters from government agencies, including the FDA, are subject to judicial notice. *E.g.*, *In re ConAgra Foods Inc.*, 908 F. Supp. 2d 1090, 1103 n.39 (C.D. Cal. 2012) (taking judicial notice of FDA letter); *Lanovaz v. Twinings N. Am., Inc.*, 2014 WL 46822 at *7 (N.D. Cal. Jan. 6, 2014) (same).

The letters also are subject to judicial notice as records of other cases. The March 7, 2013 letter (Exhibit 7) was filed in *Astiana v. Hain Celestial Grp.*, N.D. Cal. Case No. 11-cv-6342, Exhibit B to Declaration of Joseph Kravek, Jr. in Support of Plaintiff's Response to Motion to Stay, July 30, 2015 (Dkt. No. 113-2). The January 6, 2014 letter (Exhibit 8) was filed in three district courts, including in *Barnes v. Campbell Soup Co.*, N.D. Cal. Case No. 3:12-cv-05185 on January 7, 2014 (Dkt. No. 56), *Cox v. Gruma Corp.*, N.D. Cal. Case No. 4:12-cv-06502, Order Lifting Stay after receipt of the Jan. 6, 2014 FDA Letter (Dkt. No. 70), and *In re Gen. Mills, Inc. Kix Cereal Litig.*, D.N.J Case No. 2:12-cv-00249 (Dkt. No. 94).

Dated: July 14, 2017

**BURSOR & FISHER, P.A.**

By: ___*/s/ Joel D. Smith*___
      Joel D. Smith

L. Timothy Fisher (State Bar No. 191626)
Joel D. Smith (State Bar No. 244902)
Yeremey O. Krivoshey (State Bar No.295032)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Email: ltfisher@bursor.com
      jsmith@bursor.com
      ykrivoshey@bursor.com

**NATHAN & ASSOCIATES, APC**
Reuben D. Nathan (State Bar No. 208436)
600 W. Broadway, Suite 700
San Diego, California 92101
Telephone: (619)272-7014
Facsimile: (619)330-1819
E-Mail: rnathan@nathanlawpractice.com

*Attorneys for Plaintiffs*

**Exhibit 1**

Thereafter, before the accumulation of 16,000 flight cycles on any affected NLG main fitting having a part number as identified in paragraph 1.A., tables 1., 2., and 3. of BAE Systems (Operations) Limited Inspection Service Bulletin ISB.32–186, dated April 12, 2012, replace each affected nose landing gear (NLG) main fitting, in accordance with the Accomplishment Instructions of that BAE Systems (Operations) Limited Inspection Service Bulletin ISB.32–186, dated April 12, 2012.

(1) For NLG main fittings that have accumulated 29,000 flight cycles or more since first installation on an airplane: Within 12 months after the effective date of this AD.

(2) For NLG main fittings that have 20,000 flight cycles or more but less than 29,000 flight cycles since first installation on an airplane: Within 24 months after the effective date of this AD.

(3) For NLG main fittings that have 16,000 flight cycles or more but less than 20,000 flight cycles since first installation on an airplane: Within 36 months after the effective date of this AD.

(4) For NLG main fittings that have accumulated less than 16,000 flight cycles since first installation on an airplane: Before accumulating 16,000 flight cycles since first installation on an airplane or within 36 months after the effective date of this AD, whichever occurs later.

**(h) Parts Installation Limitation**

As of the effective date of this AD, no person may install an NLG main fitting having a part number identified in paragraph 1.A., Tables 1., 2., and 3., of BAE Systems (Operations) Limited Inspection Service Bulletin ISB.32–186, dated April 12, 2012, unless that fitting is in compliance with the requirements of this AD.

**(i) Other FAA AD Provisions**

The following provisions also apply to this AD:

(1) *Alternative Methods of Compliance (AMOCs):* The Manager, International Branch, ANM–116, Transport Airplane Directorate, FAA, has the authority to approve AMOCs for this AD, if requested using the procedures found in 14 CFR 39.19. In accordance with 14 CFR 39.19, send your request to your principal inspector or local Flight Standards District Office, as appropriate. If sending information directly to the International Branch, send it to ATTN: Todd Thompson, Aerospace Engineer, International Branch, ANM–116, Transport Airplane Directorate, FAA, 1601 Lind Avenue SW., Renton, WA 98057–3356; telephone 425–227–1175; fax 425–227–1149. Information may be emailed to: *9-ANM-116-AMOC-REQUESTS@faa.gov.* Before using any approved AMOC, notify your appropriate principal inspector, or lacking a principal inspector, the manager of the local flight standards district office/certificate holding district office. The AMOC approval letter must specifically reference this AD.

(2) *Contacting the Manufacturer:* For any requirement in this AD to obtain corrective actions from a manufacturer, the action must be accomplished using a method approved by the Manager, International Branch, ANM–

116, Transport Airplane Directorate, FAA; or the European Aviation Safety Agency (EASA); or BAE Systems (Operations) Limited's EASA Design Organization Approval (DOA). If approved by the DOA, the approval must include the DOA-authorized signature.

**(j) Related Information**

(1) Refer to Mandatory Continuing Airworthiness Information (MCAI) European Aviation Safety Agency (EASA) Airworthiness Directive 2012–0191R1, dated November 6, 2012, for related information. This MCAI may be found in the AD docket on the Internet at *http://www.regulations.gov* by searching for and locating Docket No. FAA–2015–4212.

(2) For service information identified in this AD, contact BAE Systems (Operations) Limited, Customer Information Department, Prestwick International Airport, Ayrshire, KA9 2RW, Scotland, United Kingdom; telephone +44 1292 675207; fax +44 1292 675704; email *RApublications@baesystems.com;* Internet *http://www.baesystems.com/Businesses/RegionalAircraft/index.htm.* You may view this service information at the FAA, Transport Airplane Directorate, 1601 Lind Avenue SW., Renton, WA. For information on the availability of this material at the FAA, call 425–227–1221.

Issued in Renton, Washington, on October 30, 2015.

**Michael Kaszycki,**

*Acting Manager, Transport Airplane Directorate, Aircraft Certification Service.*

[FR Doc. 2015–28561 Filed 11–10–15; 8:45 am]

**BILLING CODE 4910–13–P**

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Food and Drug Administration**

**21 CFR Part 101**

**[Docket No. FDA–2014–N–1207]**

**Use of the Term "Natural" in the Labeling of Human Food Products; Request for Information and Comments**

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Notification of request for comments.

---

**SUMMARY:** The Food and Drug Administration (FDA or we) is announcing the establishment of a docket to receive information and comments on the use of the term "natural" in the labeling of human food products, including foods that are genetically engineered or contain ingredients produced through the use of genetic engineering. We are taking this action in part because we received three citizen petitions asking that we define

the term "natural" for use in food labeling and one citizen petition asking that we prohibit the term "natural" on food labels. We also note that some Federal courts, as a result of litigation between private parties, have requested administrative determinations from FDA regarding whether food products containing ingredients produced using genetic engineering or foods containing high fructose corn syrup may be labeled as "natural." We are working with the United States Department of Agriculture (USDA) Agricultural Marketing Service and Food Safety and Inspection Service to also examine the use of the term "natural" in meat, poultry, and egg products, and are considering areas for coordination between FDA and USDA. We invite public comment on the term "natural" in the context of food labeling and on specific questions contained in this document.

**DATES:** Comments must be received on or before February 10, 2016.

**ADDRESSES:** You may submit comments as follows:

*Electronic Submissions*

Submit electronic comments in the following way:

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting comments. Comments submitted electronically, including attachments, to *http://www.regulations.gov* will be posted to the docket unchanged. Because your comment will be made public, you are solely responsible for ensuring that your comment does not include any confidential information that you or a third party may not wish to be posted, such as medical information, your or anyone else's Social Security number, or confidential business information, such as a manufacturing process. Please note that if you include your name, contact information, or other information that identifies you in the body of your comments, that information will be posted on *http://www.regulations.gov.*

• If you want to submit a comment with confidential information that you do not wish to be made available to the public, submit the comment as a written/paper submission and in the manner detailed (see "Written/Paper Submissions" and "Instructions").

*Written/Paper Submissions*

Submit written/paper submissions as follows:

• *Mail/Hand delivery/Courier (for written/paper submissions):* Division of Dockets Management (HFA–305), Food and Drug Administration, 5630 Fishers Lane, Rm. 1061, Rockville, MD 20852.

• For written/paper comments submitted to the Division of Dockets Management, FDA will post your comment, as well as any attachments, except for information submitted, marked and identified, as confidential, if submitted as detailed in "Instructions."

*Instructions:* All submissions received must include Docket No. FDA–2014–N–1207 for "Use of the Term "Natural" in the Labeling of Human Food Products; Request for Information and Comments." Received comments will be placed in the docket, and except for those submitted as "Confidential Submissions," publicly viewable at *http://www.regulations.gov* or at the Division of Dockets Management between 9 a.m. and 4 p.m., Monday through Friday.

• *Confidential Submissions*—To submit a comment with confidential information that you do not wish to be made publicly available, submit your comments only as a written/paper submission. You should submit two copies total. One copy will include the information you claim to be confidential with a heading or cover note that states "THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION." The Agency will review this copy, including the claimed confidential information, in its consideration of comments. The second copy, which will have the claimed confidential information redacted/blacked out, will be available for public viewing and posted on *http://www.regulations.gov.* Submit both copies to the Division of Dockets Management. If you do not wish your name and contact information to be made publicly available, you can provide this information on the cover sheet and not in the body of your comments and you must identify this information as "confidential." Any information marked as "confidential" will not be disclosed except in accordance with 21 CFR 10.20 and other applicable disclosure law. For more information about FDA's posting of comments to public dockets, see 80 FR 56469, September 18, 2015, or access the information at: *http://www.fda.gov/regulatoryinformation/dockets/default.htm.*

*Docket:* For access to the docket to read background documents or the electronic and written/paper comments received, go to *http://www.regulations.gov* and insert the docket number, found in brackets in the heading of this document, into the "Search" box and follow the prompts and/or go to the Division of Dockets Management, 5630 Fishers Lane, Rm. 1061, Rockville, MD 20852.

**FOR FURTHER INFORMATION CONTACT:**
Loretta Carey, Center for Food Safety and Applied Nutrition (HFS–820), Food and Drug Administration, 5100 Paint Branch Pkwy., College Park, MD 20740, 240–402–2371.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

*A. What has been FDA's position regarding the use of the term ``natural?''*

Under section 403(a)(1) of the Federal Food, Drug, and Cosmetic Act (the FD&C Act) (21 U.S.C. 343(a)(1)), a food shall be deemed to be misbranded if its labeling is false or misleading in any particular. Section 201(f) of the FD&C Act (21 U.S.C. 321(f)) defines the term "food" to mean articles used for food or drink for man or other animals, chewing gum, and article, and articles used for components of any such article. Subject to certain exceptions, dietary supplements are generally considered to be foods under the FD&C Act (21 U.S.C. 321(ff)). Section 201(n) of the FD&C Act (21 U.S.C. 321(n)) provides that labeling is misleading if, among other things, it fails to reveal facts that are material in light of representations made or suggested in the labeling, or material with respect to consequences that may result from the use of the food to which the labeling relates under the conditions of use prescribed in the labeling, or under such conditions of use as are customary or usual. Section 201(m) of the FD&C Act defines "labeling" as all labels and other written, printed, or graphic matter upon any article or any of its containers or wrappers or accompanying such article.

We have a longstanding policy for the use of the term "natural" on the labels of human food. We previously considered establishing a definition for the term "natural" when used in food labeling. In the preamble of a proposed rule we published in the **Federal Register** (56 FR 60421, November 27, 1991), we stated that the word "natural" is often used to convey that a food is composed only of substances that are not manmade and is, therefore, somehow more wholesome. We also said that we have not attempted to restrict use of the term "natural" except for added color, synthetic substances, and flavors under § 101.22 (21 CFR 101.22) (56 FR 60421 at 60466). Further, we said that we have considered "natural" to mean that nothing artificial or synthetic (including colors regardless of source) is included in, or has been added to, the product that would not normally be expected to be there (56 FR 60421 at 60466).

We also noted that the term "natural" is used on a variety of products to mean a variety of things. Because of its widespread use, and the evidence that consumers regard many uses of this term as non-informative, we said, back in 1991, that we were considering establishing a definition for this term (56 FR 60421 at 60466). We said that we believed that defining the term "natural" could remove some ambiguity surrounding use of the term that results in misleading claims (56 FR 60421 at 60466).

We invited comments on several questions, including whether we should establish a meaningful definition for "natural" so that this term would have a common consumer understanding, and whether it should prohibit "natural" claims entirely on the grounds that they are false or misleading (56 FR 60421 at 60467). In the preamble to the subsequent final rule, we noted that we had received many comments on the subject, but that "[n]one of the comments provided FDA with a specific direction to follow for developing a definition regarding the use of the term 'natural.' " (58 FR 2302 at 2407, January 6, 1993). We stated that at that time we would not be engaging in rulemaking to define "natural," but that we would maintain our policy not to restrict the use of the term "natural" except for added color, synthetic substances, and flavors. ==We further stated that we would maintain our policy to interpret the term "natural" as meaning that "nothing artificial or synthetic (including all color additives regardless of source) has been included in, or has been added to, a food that would not normally be expected to be in the food"== (58 FR 2302 at 2407).

When we established our policy concerning the use of the term "natural," as described previously in this document, it was not intended to address food production methods, such as the use of genetic engineering or other forms of genetic modification, the use of pesticides, or the use of specific animal husbandry practices, nor did it explicitly address food processing or manufacturing methods, such as thermal technologies, pasteurization, or irradiation. Furthermore, we did not consider whether the term "natural" should describe any nutritional or other health benefit.

*B. What recent events prompted FDA to request comment?*

In a citizen petition (now filed under docket number FDA–2014–P–0312) dated March 14, 2014, the Grocery Manufacturers Association (GMA) requests that we "issue a regulation

authorizing statements such as 'natural' on foods that are or contain foods derived from biotechnology'' (see Citizen Petition from the Grocery Manufacturers Association to the Food and Drug Administration (''Petition'') at page 1). Specifically, GMA requests that we issue a regulation ''that it is neither false nor misleading to label a food as 'natural' or similar terms solely because the food is or contains a food derived from biotechnology'' (Petition at page 3). GMA requests that FDA issue a regulation establishing that the term(s) ''natural,'' ''all natural,'' ''100% natural,'' ''from nature,'' ''naturally grown,'' or ''naturally sourced'' may accompany the common or usual name of a food, or the name of a standardized food, or appear elsewhere on the label or in labeling of such foods, and that such a food shall not be deemed to be misbranded solely because the food contains a food derived from biotechnology (Petition at page 3).

Alternatively, GMA requests that we amend § 101.4 (*Food; designation of ingredients.*) by adding a new paragraph stating that: A food bearing a claim that its ingredient or ingredients are ''natural,'' ''all natural,'' ''100% natural,'' ''from nature,'' ''naturally grown,'' or ''naturally sourced'' shall not be deemed misbranded solely because the ingredient or ingredients are derived from biotechnology (Petition at page 3, footnote 2). The GMA citizen petition also describes, in the petitioner's view, the legal and factual basis for a regulation and why rulemaking is in the public interest (see Petition at pages 5 through 15).

The GMA citizen petition follows earlier communications to FDA regarding the use of the term ''natural'' on the labels of food containing ingredients produced using genetic engineering. For example, three Federal district courts referred to us, for an administrative determination under 21 CFR 10.25(c), the question of whether food products containing ingredients produced using bioengineering may be labeled as ''Natural,'' ''All Natural,'' and/or ''100% Natural.'' See Letter from Leslie Kux, Assistant Commissioner for Policy, to the Honorable Yvonne Gonzales Rogers, U.S. District Court, Northern District of California, the Honorable Jeffrey S. White, U.S. District Court, Northern District of California, and the Honorable Kevin McNulty, U.S. District Court, District of New Jersey (January 6, 2014) (''Courts Letter''); see also Letter from Karin F. R. Moore, Vice President and General Counsel, Grocery Manufacturers Association, to Elizabeth H. Dickinson, Esq., Chief Counsel, FDA (December 5, 2013) (mentioning the

district courts' referrals to FDA and stating that FDA has authority to issue a regulation authorizing foods containing ingredients derived from biotechnology to be labeled ''natural''). Although we declined to make a determination for the courts regarding whether and under what circumstances food products containing ingredients produced using genetic engineering may or may not be labeled ''natural,'' we informed the courts that, if we were inclined to revoke, amend, or revise our policy regarding use of the term ''natural,'' we would likely engage in a public process and work with other Federal entities, such as the U.S. Department of Agriculture (USDA) (see Courts Letter at page 2). We issued a similar response to a Federal district court, in 2010, when it asked whether high fructose corn syrup qualified as a ''natural'' ingredient. See Letter from Michael M. Landa, Acting Director, Center for Food Safety and Applied Nutrition, to the Honorable Jerome B. Simandle, U.S. District Court Judge, District of New Jersey (September 16, 2010).

On October 3, 2014, we received a citizen petition from Consumers Union (see FDA–2014–P–1650) requesting that we prohibit use of the term ''natural'' on food labels altogether. The Consumers Union citizen petition asserts that there is a ''drastic'' difference between FDA's current policy for use of the term ''natural'' and ''what people think the 'natural' label should mean'' (Citizen Petition from the Consumers Union to FDA (''Petition'') at page 1). More specifically, Consumers Union requests that FDA issue the following interpretive rule prohibiting use of the term ''natural'' in food labeling: ''*The term 'natural,' or any derivation of the term, such as 'naturally grown,' 'naturally sourced' or 'from nature,' is vague and misleading and should not be used*'' [emphasis in the original] (see Petition at page 3).

The Consumers Union citizen petition relies on Consumer Reports National Research Center survey data to support its position that consumers are misled by the term ''natural.''[1] According to the petition, the survey suggests that nearly two-thirds of U.S. consumers are currently misled by use of the term ''natural'' on certain food labels and nearly 90 percent expect it to ''mean much more than it does'' (see Petition at page 2 and pages 4 through 9). For

example, according to the petition, ''Sixty-six percent of consumers think 'natural' processed food products mean no toxic pesticides were used, 66% think no artificial ingredients or colors were used, 65% think no chemicals were used during processing and 64% think no GMOs were used'' (see Petition at page 2). Also, according to the petition, when consumers were asked what they thought the term natural should mean, ''87% believe no artificial materials or chemicals should be used during processing, 86% believe no artificial ingredients or colors should be used, 86% believe no toxic pesticides should be used, and 85% believe no GMOs should be used'' (see Petition at page 2).

Consumers Union asserts that it has observed a push from industry to allow the use of the term ''natural'' on food labels that do not represent what their survey indicates consumers believe the term natural should mean (see Petition at page 3). Consumers Union further states that ''consumers demand far more from the 'natural' label, in line with what they expect from the 'organic' label'' such that the term ''natural'' in food labeling ''should be banned altogether'' (see Petition at page 3).

We also have received two other citizen petitions concerning the use of the term ''natural'' on food labels. One citizen petition, from the Sara Lee Corp. (see FDA–2007–P–0007), asks that we work with USDA's Food Safety Inspection Service (FSIS) to devise and adopt a unified policy, as a statement of policy, governing use of the term ''natural'' such that use of the term ''natural'' may be used to describe a food or food ingredient that does not contain any artificial flavor or flavoring, coloring ingredient (regardless of source), or any artificial or synthetic ingredient that is included within or not normally expected in the product (see Petition at page 2). Further, the Sara Lee Corp. asserts that the degree of processing necessary to produce the food or food ingredient should be considered in determining consumer expectation.

Another citizen petition, submitted by The Sugar Association (see FDA–2006–P–0206), asks that we engage in rulemaking to define the term ''natural'' with respect to food and beverages. The citizen petition asks for consistency across Federal Agencies with respect to such definition and requests that we define the term ''natural'' based on FSIS's definition in its Food Standards and Labeling Policy Book for ''natural'' claims for meat products and poultry products (see Petition at page 1).

---

[1] Consumer Reports National Research Center Survey Research Report re Citizen Petition from Consumers Union, FDA–2014–P–1650–0002. According to Consumers Union, the survey was a nationally representative phone survey of over 1000 adult U.S. residents.

The definition of "natural claims" in the FSIS's Food Standards and Labeling Policy Book, in relevant part, states that the term "natural" may be used on labeling for meat products and poultry products if the applicant for such labeling demonstrates that: (1) The product does not contain any artificial flavor or flavoring, coloring ingredient, chemical preservative (as defined in § 101.22), or any other artificial or synthetic ingredient and (2) the product and its ingredients are not more than minimally processed. The FSIS Food Standards and Labeling Policy Book further explains that minimal processing may include traditional processes used to make food edible or to preserve it or to make it safe for human consumption, *e.g.*, smoking, roasting, freezing, drying, and fermenting or physical processes which do not fundamentally alter the raw product and/or which only separate a whole, intact food into component parts, *e.g.*, grinding meat, separating eggs into albumen and yolk, and pressing fruits to produce juices. The FSIS Food Standards and Labeling Policy Book also states that relatively severe processes, such as solvent extraction, acid hydrolysis, and chemical bleaching, would be considered more than minimal processing, so the use of a natural flavor or flavoring in compliance with § 101.22 that has undergone more than minimal processing would place a product in which it is used outside the scope of the FSIS guidelines. However, the FSIS Food Standards and Labeling Policy Book states that the presence of an ingredient that has been more than minimally processed would not necessarily preclude the product from being promoted as natural, and that exceptions can be granted on a case-by-case basis if it can be demonstrated that the use of such an ingredient would not significantly change the character of the product to the point that it could no longer be considered a natural product. In such cases, the natural claim is to be qualified to clearly and conspicuously identify the ingredient, *e.g.*, "all natural or all natural ingredients except dextrose, modified food starch, etc."

The FSIS Food Standards and Labeling Policy Book also states that all products claiming to be natural or a natural food should be accompanied by a brief statement that explains what is meant by the term natural, *i.e.*, that the product is a natural food because it contains no artificial ingredients and is only minimally processed. The statement is to appear directly beneath or beside all natural claims or, if

elsewhere on the principal display panel, an asterisk should be used to tie the explanation to the claim.

Moreover, the FSIS Food Standards and Labeling Policy Book specifies that FSIS's decision to approve or deny use of a natural claim may be affected by the specific context in which the claim is made. The FSIS Food Standards and Labeling Policy Book contains an example showing that claims indicating that a product is natural food, *e.g.*, "Natural chili" or "chili—a natural product" would be unacceptable for a product containing beet powder, which artificially colors the finished product, but states that a claim such as "all natural ingredients" might be an acceptable claim for such a product (see Food Standards and Labeling Policy Book, FSIS, at 116, August 2005).

Both the Sara Lee Corp. and The Sugar Association citizen petitions also state that defining or establishing a policy on "natural" would provide consistency for consumers and food manufacturers.

## II. Request for Comments and Information

We invite interested persons to comment on the use of the term "natural" in the labeling of human food products, including when, if ever, the use of the term is false or misleading (FDA–2014–N–1207). We are particularly interested in responses to the following questions:

• <mark>Should we define, through rulemaking, the term "natural?" Why or why not?</mark>

• Should we prohibit the term "natural" in food labeling? Why or why not?

• If we define the term "natural," what types of food should be allowed to bear the term "natural?"

• Should only raw agricultural commodities be able to bear the term? Why or why not? Section 201(r) of the FD&C Act defines the term "raw agricultural commodity" as "any food in its raw or natural state, including all fruits that are washed, colored, or otherwise treated in their unpeeled natural form prior to marketing."

• Should only single ingredient foods, *e.g.*, bottled water or bagged spinach, be able to bear the term? Why or why not?

• If multi-ingredient foods should be able to bear the term, what type(s) of ingredients would disqualify the food from bearing the term? Please explain why such disqualification would be warranted.

• We are interested in any data or other information to suggest that consumers associate, confuse, or

compare the term "natural" with "organic" (the USDA Agricultural Marketing Service administers the National Organic Program, which enforces laws and regulations regarding certified organic foods). We are interested in data and other information about consumers' understanding of foods labeled "natural" versus "organic." Is the term "natural" on food labels perceived by consumers the same way as "organic?" Or is "natural" perceived by consumers to be "better" (or not as good as) "organic?" Please provide consumer research or other evidence to support your comment.

• If we were to revise our policy regarding the use of the term "natural" or engage in rulemaking to establish a regulatory definition for "natural," should certain production practices used in agriculture, for example, genetic engineering, mutagenesis, hybridization, the use of pesticides, or animal husbandry practices, be a factor in defining "natural?" Why or why not?

• We are interested in any data or other information to suggest that consumers associate, confuse, or compare the term "natural" with "healthy." We have a regulation that defines the term "healthy" when used as an implied nutrient content claim with specific conditions related to the food's nutrient profile that must be met in order to use the term on the label or in labeling of a food (see § 101.65(d)). We are interested in data and other information about consumers' understanding of foods labeled "natural" versus "healthy." Is the term "natural" on food labels perceived by consumers the same way as "healthy?" Or is "natural" perceived by consumers to be "better" (or not as good as) "healthy?" Do consumers view "natural" and "healthy" as synonymous terms? Please provide consumer research or other evidence to support your comment.

• Should manufacturing processes be considered in determining when a food can bear the term "natural?" For example, should food manufacturing processes, such as drying, salting, marinating, curing, freezing, canning, fermenting, pasteurizing, irradiating, or hydrolysis, be a factor in defining "natural?"

• Should the term "natural" only apply to "unprocessed" foods? If so, how should "unprocessed" and "processed" be defined for purposes of bearing the claim? If the term natural should include some processing methods, what should those methods be? In making determinations related to processing, should one look at the process to make a single ingredient of a

food, or does one evaluate the process done to the formulated finished food product (or both)?

• The current policy regarding use of the term "natural" hinges in part on the presence or absence of synthetic ingredients. For example, under the current policy synthetic forms of Vitamin D would not be used in a food claiming to be "natural," whereas naturally sourced Vitamin D (e.g., from salmon or egg yolks) could be. Should the manner in which an ingredient is produced or sourced affect whether a food containing that ingredient may be labeled as "natural?" Please explain your reasoning.

• What can be done to ensure that consumers have a consistent and accurate understanding of the term "natural" in food labeling to ensure that it is not misleading?

• What are the public health benefits, if any, of defining the term "natural" in food labeling? Please provide supporting data and other information to support your comment.

• Should "natural" have some nutritional benefit associated with it? If so, what should be the benefit? What nutrients should be considered? What data are available to support the association between "natural" and a given nutritional benefit, and/or between "natural" and certain nutrients?

• How might we determine whether foods labeled "natural" comply with any criteria for bearing the claim?

Dated: November 6, 2015.

**Leslie Kux,**

*Associate Commissioner for Policy.*

[FR Doc. 2015–28779 Filed 11–10–15; 8:45 am]

**BILLING CODE 4164–01–P**

---

## DEPARTMENT OF VETERANS AFFAIRS

**38 CFR Part 17**

**RIN 2900–AP06**

## Ensuring a Safe Environment for Community Residential Care Residents

**AGENCY:** Department of Veterans Affairs.

**ACTION:** Proposed rule.

**SUMMARY:** This document proposes to amend the Department of Veterans Affairs (VA) regulations governing the approval of a community residential care facility (CRC). We would prohibit a CRC from employing an individual who has been convicted in a court of law of certain listed crimes against a person or property, or has had a finding entered into an applicable state registry

or with the applicable licensing authority concerning abuse, neglect, mistreatment of individuals or misappropriation of property. VA also proposes to require CRCs to develop and implement written policies and procedures that prohibit mistreatment, neglect, and abuse of residents and misappropriation of resident property. The proposed rule would also require CRCs to report and investigate any allegations of abuse or mistreatment. In addition, the proposed rule would require the CRC to screen and monitor individuals who are not CRC residents, but have direct access to a veteran living in a CRC. The revisions would improve the safety and help prevent the neglect or abuse of veteran residents in CRCs. In addition, we propose to amend the rule regarding the maximum number of beds allowed in a resident's bedroom.

**DATES:** *Comment Date:* Comments must be received by VA on or before January 11, 2016.

**ADDRESSES:** Written comments may be submitted through *www.regulations.gov;* by mail or hand-delivery to the Director, Regulation Policy and Management (02REG), Department of Veterans Affairs, 810 Vermont Ave. NW., Room 1068, Washington, DC 20420; or by fax to (202) 273–9026. Comments should indicate that they are submitted in response to "RIN 2900–AP06—Ensuring a Safe Environment for Community Residential Care Residents." Copies of comments received will be available for public inspection in the Office of Regulation Policy and Management, Room 1068, between the hours of 8:00 a.m. and 4:30 p.m., Monday through Friday (except holidays). Please call (202) 461–4902 for an appointment. (This is not a toll-free number.) In addition, during the comment period, comments may be viewed online through the Federal Docket Management System (FDMS) at *http://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Dr. Richard Allman, Chief Consultant, Geriatrics and Extended Care Services (10P4G), Veterans Health Administration, Department of Veterans Affairs, 810 Vermont Ave. NW., Washington, DC 20420, (202) 461–6750. (This is not a toll-free number.)

**SUPPLEMENTARY INFORMATION:** VA is authorized under 38 U.S.C. 1730 to assist veterans by referring them for placement, and aiding veterans in obtaining placement, in CRCs. A CRC is a form of enriched housing that provides health care supervision to eligible veterans not in need of hospital or nursing home care, but who, because of medical, psychiatric and/or

psychosocial limitations as determined through a statement of needed care, are not able to live independently and have no suitable family or significant others to provide the needed supervision and supportive care. Examples of CRC's enriched housing may include, but are not limited to: Medical Foster Homes, Assisted Living Homes, Group Living Homes, Family Care Homes, and psychiatric CRC Homes. CRC care consists of room, board, assistance with activities of daily living (ADL), and supervision as required on an individual basis. The size of a CRC can vary from one bed to several hundred. VA maintains a list of approved CRCs. The cost of community residential care is financed by the veteran's own resources. A veteran may elect to reside in any CRC he or she wants; however, VA will only recommend CRCs that apply for approval and meet VA's standards. Once approved, the CRC is placed on VA's referral list and VA refers veterans for whom CRC care is an option to the VA-approved CRCs when those veterans are determining where they would like to live. VA may provide care to a veteran at the CRC when it is medically appropriate to provide such home-based care. The provision of such home-based care is not contingent upon VA approval of a CRC; a veteran's right to such care exists independent of the veteran's residence in a CRC. Employees of the CRC are not VA employees, and no employment relationship exists between employees of the CRC and VA.

To become approved, a CRC must meet the specified criteria in 38 CFR 17.63, which sets forth standards relating to the physical integrity of the facility, the health care provided at the CRC, the standard of living therein, costs charged directly to veteran residents of the CRC, and other criteria for approval.

VA has authority under 38 U.S.C. 1730(b)(2) to establish criteria for approval of a CRC that will ensure the health, safety and welfare of veterans residing in that facility. Current § 17.63(j) requires CRCs to maintain sufficient, qualified staff on duty who are available to care for residents and ensure the health and safety of each resident. The CRC provider and staff must have adequate education, training, or experience to maintain the facility. However, VA believes that other issues are also important in determining whether a veteran residing in a CRC is receiving an appropriate standard of care. A veteran residing in a CRC is unable to live independently and has no suitable family or significant others to provide the needed supervision and supportive care, and the CRC serves as

**Exhibit 2**

1

2

3

4                          UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7    SKYE ASTIANA, et al.,

8                 Plaintiffs,                    Case No. 11-cv-6342-PJH

9         v.                                     **ORDER GRANTING MOTION TO STAY**

10   THE HAIN CELESTIAL GROUP, INC.,
     et al.,

11
                  Defendants.
12

13

14          Before the court is defendants' motion to stay.  Defendants seek a stay based on

15   two grounds:  (1) the need to refer this case to the FDA based on the finding of this court

16   and the Ninth Circuit that the primary jurisdiction doctrine applies, and (2) the pendency

17   of two cases before the Ninth Circuit involving issues relevant to this case.

18          Regarding issue (1), the Ninth Circuit held that this court "properly invoked the

19   primary jurisdiction doctrine," but "erred by dismissing the case rather than issuing a stay

20   pending potential agency action" by the FDA.  Astiana v. Hain Celestial Group, Inc., 783

21   F.3d 753, 756 (9th Cir. 2015).  On remand, the Ninth Circuit held that this court "may

22   consider whether events during the pendency of this appeal have changed the calculus

23   on whether further FDA proceedings are necessary."  Id.  Specifically, the Ninth Circuit

24   pointed to "Astiana's informal letter, the FDA's website publication of a Small Business

25   Fact Sheet regarding cosmetics labeling, and the FDA's response to other courts," and

26   directed this court to consider whether those events "affect the need for further

27   proceedings at the FDA or demonstrate that another referral to the agency would be

28   futile."  Id. at 762.  The court also made clear that "a court should not invoke primary

United States District Court
Northern District of California

1    jurisdiction when the agency is aware of but has expressed no interest in the subject

2    matter of the litigation."  Id. at 761.

3            While defendants argue that plaintiffs' letter to the FDA "should be disregarded"

4    because it was procedurally improper given the pendency of the appeal and the lack of

5    any judicial referral, the court still finds the substance of the exchange relevant to

6    whether a referral at this time would be futile.  The sequence of events is as follows.

7            After this court dismissed the complaint on primary jurisdiction grounds, plaintiffs'

8    counsel (Joseph Kravec) sent a letter to the FDA stating that this case "has been referred

9    by the Honorable Phyllis J. Hamilton . . . to the [FDA] for an administrative determination

10   on the meaning of the term 'natural' when used on cosmetics labels."  The letter then

11   summarized the case, and requested that the FDA either make an administrative

12   determination on the meaning of "natural" in this context, or advise that it declines to

13   make a determination.

14           Although the letter was sent in December 2012, defendants' counsel apparently

15   did not find out about it until February 2013.  Defendants' counsel then sent their own

16   letter to the FDA, telling the FDA that the court "did not refer any question to the FDA,"

17   and instead simply dismissed the case.  Thus, in defendants' view, the FDA was not

18   obligated to respond to the Kravec letter.

19           The FDA responded to the Kravec letter in March 2013.  The letter explains the

20   importance of transparency to agency proceedings, and that it would not take any action

21   on the "natural" definition without going through a notice-and-comment process.  The

22   FDA letter also explains that its resources are fully occupied with health and safety

23   matters, so proceedings to define "natural" "do not fit within our current health and safety

24   priorities."  The letter concludes by stating that "we respectfully decline to make a

25   determination regarding the term 'natural' in cosmetic labeling at this time."

26           Despite the questionable means by which the issue was brought before the FDA,

27   the court does find that the FDA's letter shows that the "agency is aware of but has

28   expressed no interest in the subject matter of the litigation."  Thus, the court finds that a

United States District Court
Northern District of California

2

1  formal referral would be futile, and thus DENIES the motion to stay to the extent that it is

2  based on the need for FDA referral.

3         However, as to (2), the court agrees that a stay is warranted based on the

4  pendency of two appeals before the Ninth Circuit, <u>Jones v. ConAgra Foods, Inc.</u> and

5  <u>Brazil v. Dole Packaged Foods, LLC</u>.  As the parties point out, both cases involve issues

6  relating to class certification and damages that will apply equally to this case.  Notably,

7  plaintiffs do not oppose a stay, and acknowledge that "[c]hanges in the legal landscape

8  could potentially require the parties supplement class certification discovery or briefing

9  that occurred in the interim."  However, plaintiffs argue that any stay should be limited to

10  six months.

11        A district court has discretionary power to stay proceedings in its own court.

12  <u>Landis v. North American Co.</u>, 299 U.S. 248, 254 (1936).  Specifically, a "trial court may,

13  with propriety, find it is efficient for its own docket and the fairest course for the parties to

14  enter a stay of an action before it, pending resolution of independent proceedings which

15  bear upon the case."  <u>Leyva v. Certified Grocers of California, Ltd.</u>, 593 F.2d 857, 863-64

16  (9th Cir. 1979).

17        Courts considering a stay should look at: (1) the possible damage which may

18  result from the granting of a stay, (2) the hardship or inequity which a party may suffer in

19  being required to go forward, and (3) the orderly course of justice measured in terms of

20  the simplifying or complicating of issues, proof, and questions of law which could be

21  expected to result from a stay.  <u>CMAX Inc. v. Hall</u>, 300 F.2d 265, 268 (9th Cir. 1962).

22        The court agrees with the parties that the above factors support a stay.  However,

23  given that any stay would be based on the pendency of the <u>Jones</u> and <u>Brazil</u> appeals,

24  rather than on any other basis urged by the parties, the court sees no benefit to limiting

25  the stay to six months.  Instead, the stay will be lifted after the Ninth Circuit issues a

26  ruling on both <u>Jones</u> and <u>Brazil</u>.  The motion to stay is thus GRANTED, and the parties

27  shall submit a status statement within fourteen days of the resolution of both <u>Jones</u> and

28  <u>Brazil</u>.

United States District Court
Northern District of California

1

2     **IT IS SO ORDERED.**

3 Dated:  October 9, 2015

4 _____

5     PHYLLIS J. HAMILTON
    United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit 3**

1

2

3

4

5

6

7

8                      IN THE UNITED STATES DISTRICT COURT

9

10                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

11   RYAN BARNES and GUILLERMO PEREZ,
     on behalf of themselves and all others similarly
12   situated,                                              No. C 12-05185 JSW

13              Plaintiffs,

14       v.                                                 **ORDER LIFTING STAY AND
                                                            DIRECTING PARTIES TO FILE
15   CAMPBELL SOUP COMPANY,                                 BRIEFING**

16              Defendant.
                                                        /
17   _____

18          By order dated July 25, 2013, the Court stayed this action for a period of six months and

19   referred to the United States Food and Drug Administration ("FDA") for an administrative

20   determination, the question whether and under what circumstances food products containing

21   ingredients produced using bioengineered seed may or may not be labeled "Natural" or "All

22   Natural."

23          The FDA has now responded to that referral.  In light of that response, the Court

24   HEREBY ORDERS as follows:

25          (1)    the stay of this action is lifted;

26          (2)    the parties are directed to file responsive briefs addressing the effect of the

27                 FDA's position, as stated in its response letter, on the course of this litigation.

28                 The responsive briefs shall not exceed 15 pages and shall be filed by no later

**United States District Court**
For the Northern District of California

1    than February 14, 2014.  Each side shall be permitted to file a rebuttal of no

2    more than 10 pages by February 21, 2014.

3    **IT IS SO ORDERED.**

4

5    Dated:   January 24, 2014



6    JEFFREY S. WHITE
     UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

2

**Exhibit 4**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**ELIZABETH COX,** individually and on behalf of all others similarly situated,

      Plaintiffs,

      vs.

**GRUMA CORPORATION,** *et al.*,

      Defendant.

**Case No.: 12-CV-6502 YGR**

**ORDER DIRECTING RESPONSIVE BRIEFING RE: RESPONSE LETTER FROM THE U.S. FOOD AND DRUG ADMINISTRATION**

By Order issued July 11, 2013, this Court stayed this action for a period of six months and referred to the U.S. Food and Drug Administration (FDA), for an administrative determination, the question of whether and under what circumstances food products containing ingredients produced using bioengineered seed may or may not be labeled "Natural" or "All Natural" or "100% Natural." (Dkt. No. 68.)  The court's order further stated that the Defendant's motion was granted with respect to primary jurisdiction only, and was otherwise denied without prejudice to re-filing upon an order dissolving the stay ordered herein.  (*Id.* at 4.)

The FDA has now responded to that referral.  (Dkt. No. 70.)  In light of the response, the Court **ORDERS** as follows:

(1)  the stay of this action is **DISSOLVED**;

(2) the parties are directed to file response briefs of addressing the effect of the FDA's position, as stated in the response letter, on the application of the primary jurisdiction doctrine to the claims alleged herein.  The response briefs shall be no more than ten (10) pages and shall be filed by **January 24, 2014**.  Each side shall be permitted to file a rebuttal of no more than five (5) pages by **January 31, 2014**.

**IT IS SO ORDERED.**

Date: January 10, 2014

                                                        
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

**Exhibit 5**

|                          | : |                                    |
| ------------------------ | - | ---------------------------------- |
| **CHRISTINA BEVANS,**    | : | **UNITED STATES DISTRICT COURT**   |
|                          | : | **DISTRICT OF NEW JERSEY**         |
|                          | : |                                    |
| **Plaintiff(s),**        | : |                                    |
|                          | : |                                    |
| **-vs-**                 | : | **Civil Action No.  12-249 (KM)**  |
|                          | : |                                    |
| **GENERAL MILLS, INC.,** | : | **ORDER**                          |
|                          | : |                                    |
| **Defendant(s),**        | : |                                    |
|                          | : |                                    |

**THIS MATTER** having come before the Court for a telephone conference on March 17, 2014; and for good cause shown;

**IT IS on this 18th day of March, 2014**

**ORDERED THAT:**

1.    The administrative stay is vacated and the case is restored to the active docket.

2.    All expert reports on damages shall be served 30 days after rulings on summary judgment motions.

3.    Fact discovery shall be completed by **June 30, 2014**

4.    An in person status conference is scheduled for **Wednesday, May 21, 2014 at 11:00 a.m.**  Three to five days in advance of the conference, the parties shall submit a brief status letter.

*s/Madeline Cox Arleo*
**MADELINE COX ARLEO**
**United States Magistrate Judge**

Original:    Clerk
cc:          Hon.  Kevin McNulty, U.S.D.J.
             File

**Exhibit 6**

# Small Businesses & Homemade Cosmetics: Fact Sheet

The questions and answers below are based on questions we frequently receive from people who are new to the cosmetics business, and our responses to them. This information is intended to help you get started. We've also included links for learning more on each topic. Before you send a question to FDA, please check here. You may find the answer.

**1. Does FDA regulate cosmetics?**

**2. How do I know if my products are regulated as cosmetics, and not as drugs or some other product category?**

**3. Do I need to have my cosmetic products or ingredients approved by FDA?**

**4. What do I need to know about using color additives in cosmetics?**

**5. Do I need to register my cosmetic firm or product formulations with FDA?**

**6. Can I manufacture cosmetics in my home or salon?**

**7. Can I label my cosmetics "natural" or "organic"?**

**8. Must I test my products and ingredients?**

    **9. Using available safety data**

    **10. Doing additional testing**

**11. Can I use a Post Office (P.O.) box or website for the address on the label?**

**12. Where can I learn more about labeling requirements?**

**13. What local requirements are there for starting a cosmetics business?**

**14. Do I need to get a license from FDA to manufacture or market cosmetics?**

**15. Where can I find more information on FDA requirements I need to know about?**

---

**1. Does FDA regulate cosmetics?**

Yes. FDA regulates cosmetics under the **Federal Food, Drug and Cosmetic Act (FD&C Act) (/RegulatoryInformation/LawsEnforcedbyFDA/FederalFoodDrugandCosmeticActFDCAct/FDCActChapterVICosmetics/ucm2016708.htm)**. Under this law, cosmetics must not be adulterated or misbranded. For example, they must be safe for consumers under labeled or customary conditions of use, and they must be properly labeled. Any

color additives they contain must be approved for the intended use, and some must be from batches certified in FDA's own labs. Packaging and labeling must not be deceptive. If you manufacture or market cosmetics, you have a legal responsibility for the safety and labeling of your products.

If your cosmetics are marketed to consumers on a retail basis, such as in stores, or by mail order (including online), or by personal sales representatives (for example, door-to-door sales), they also must meet ingredient labeling requirements under the **Fair Packaging and Labeling Act (/RegulatoryInformation/LawsEnforcedbyFDA/ucm148722.htm)**.

To learn more, see "**Resources for You: Industry (/Cosmetics/ResourcesForYou/Industry/ucm2005224.htm)**" and "**Cosmetics: Guidance and Regulations (/Cosmetics/GuidanceRegulation/ucm2005160.htm)**," where you will find overviews of the laws, links to the laws and regulations themselves, and more.

## 2. Do I need to have my cosmetic products or ingredients approved by FDA?

The law does not require cosmetic products and ingredients, except for **color additives (/ForIndustry/ColorAdditives/ColorAdditivesinSpecificProducts/InCosmetics/ucm110032.htm)**, to be approved by FDA before they go on the market. However, cosmetics must not be adulterated or misbranded. This means that they must be safe for consumers when used according to the labeling, or as people customarily use them, and they must be properly labeled. To learn more, see **Key Legal Concepts: Interstate Commerce, Adulterated, and Misbranded (/Cosmetics/GuidanceRegulation/LawsRegulations/ucm074248.htm)**.

With the exception of color additives and **ingredients that are prohibited or restricted by FDA regulations (/Cosmetics/GuidanceRegulation/LawsRegulations/ucm127406.htm)**, you may use any ingredient in your cosmetic, as long as it does not cause the product to be adulterated in any way. You are legally responsible for making sure your cosmetics are safe and properly labeled, in compliance with all the laws and regulations that apply to them.

Remember, however, that not all "personal care products" are regulated as cosmetics under U.S. law. For example, some are regulated as drugs. If your product is a drug under U.S. law, it must meet the requirements for drugs, such as premarket approval.

## 3. How do I know if my products are regulated as cosmetics, and not as drugs or some other product category?

A product's intended use is determined by factors such as claims made for the product, consumer expectations, and certain ingredients. A product is a cosmetic if it is intended for uses such as cleansing the human body, making a person more attractive, or changing a person's appearance. Here are some examples of products marketed as cosmetics:

- Makeup
- Moisturizers
- Hair dyes, permanent waves, straighteners, and removers
- Perfumes and colognes
- Nail care products

If a product is intended to affect the way a person's body works, or to treat or prevent disease, it's a drug, but sometimes it is both a cosmetic and a drug depending on its claims. Drugs must meet different requirements.

Some "personal care products" are regulated by FDA as medical devices or as dietary supplements, while others, including some soaps, are regulated by the Consumer Product Safety Commission. Here are some resources to help you learn more:

- **Aromatherapy (/Cosmetics/ProductsIngredients/Products/ucm127054.htm)**
- **Consumer Product Safety Commission (http://www.cpsc.gov/)**
- "**Cosmeceutical (/Cosmetics/Labeling/Claims/ucm127064.htm)**"
- **Cosmetics Q&A: Personal Care Products (/Cosmetics/ResourcesForYou/Consumers/ucm136560.htm)**
- **Dietary Supplements (/Food/DietarySupplements/ucm2006892.htm)**
- **Is It a Cosmetic, a Drug, or Both? (Or Is It Soap?) (/Cosmetics/GuidanceRegulation/LawsRegulations/ucm074201.htm)**: To learn more about these product categories, including how FDA determines a product's intended use.
- **Soap (/Cosmetics/ProductsIngredients/Products/ucm115449.htm)**
- **Warning Letters Highlight Differences Between Cosmetics and Medical Devices (/Cosmetics/ComplianceEnforcement/WarningLetters/ucm081141.htm)**

**4. What do I need to know about using color additives in cosmetics?**

A color additive, other than coloring materials intended for use as coal-tar hair dyes, must be approved by FDA for the intended use. These are listed in regulations called "listing regulations." Some may be used only if they are from batches certified in FDA's own labs. Here are some resources to help you learn more:

- **Color Additives and Cosmetics (/ForIndustry/ColorAdditives/ColorAdditivesinSpecificProducts/InCosmetics/ucm110032.htm)** — An overview
- **Color Additives Permitted for Use in Cosmetics (/Cosmetics/Labeling/IngredientNames/ucm109084.htm)** — A quick-reference table, with links to the listing regulation for each of these color additives
- **Color Additive Regulations (/Cosmetics/Labeling/IngredientNames/ucm109084.htm)** — For links to the color additive regulations themselves

**5. Do I need to register my cosmetic firm or product formulations with FDA?**

FDA encourages both domestic and foreign cosmetic firms to register their establishments and file their product formulations with our Voluntary Cosmetic Registration Program (VCRP), but participation in this program is voluntary. Participating in the VCRP does not indicate FDA approval, and no registration number is required to import cosmetics into the United States. In fact, the VCRP will only accept information on cosmetics that are already on the market in this country.

If, however, your products are drugs, or both cosmetics and drugs, they must meet the requirements for drug registration. Similarly, importers of cosmetic ingredients that are also classified as food products must meet the registration requirements of the **Bioterrorism Act of 2002 (/RegulatoryInformation/LawsEnforcedbyFDA/ucm148797.htm)**.

**6. Can I manufacture cosmetics in my home or salon?**

It's not against the law to manufacture cosmetics in your home. Keep in mind, however, that it's your responsibility to manufacture products in an environment that will not cause them to become adulterated.

FDA does not have regulations specifying good manufacturing practices (GMP) for cosmetics. However, "**Good Manufacturing Practice (GMP) Guidelines/Inspection Checklist (/Cosmetics/GuidanceRegulation/GuidanceDocuments/ucm2005190.htm)**" is a list of factors an FDA investigator will look at during an inspection. We have posted this list of GMP guidelines to alert firms to some factors to keep in mind when planning their manufacturing conditions and procedures. Even if you are manufacturing your products in your home or salon, these guidelines will help you keep your process and your products safe.

Here are some of the ways in which a cosmetic can become adulterated:

- Color additive violations: Misuse of color additives makes a product adulterated.

- Prohibited and restricted ingredients: Violating the restrictions on the use of these substances makes a cosmetic adulterated.

- Packaging: The composition of its container may make the contents "injurious to health."

- Microbial contamination: Cosmetics are not required to be sterile, but microbial contamination can pose a health hazard, making a product adulterated. (See "How must I test my products and ingredients?")

- Other contaminants: Unwanted substances from a number of sources may adulterate a product.

- Any other problem that could make the product unsafe for consumers when they use it according to directions on the label, or as it is customarily used. (See the **FD&C Act, Section 601 (/RegulatoryInformation/LawsEnforcedbyFDA/FederalFoodDrugandCosmeticActFDCAct/FDCActChapterVI Cosmetics/ucm2016708.htm)**)

### 7. Can I label my cosmetics "natural" or "organic"?

The same requirements for safety and labeling apply to all cosmetics, no matter what their source. This includes, for example, making sure that all your labeling is truthful and not misleading.

FDA has not defined the term "natural" and has not established a regulatory definition for this term in cosmetic labeling.

FDA also does not have regulations for the term "organic" for cosmetics. The U.S. Department of Agriculture (USDA) regulates the use of the term "organic" for agricultural products under the National Organic Program (NOP). If you have questions about the use of the term "organic," contact **USDA (http://www.ams.usda.gov/AMSv1.0/nop)**. Answers to some common questions about "organic" cosmetics are available on our website under "'**Organic' Cosmetics (/Cosmetics/Labeling/Claims/ucm203078.htm)**."

Don't use terms such as "natural" as part of an ingredient statement, because ingredients must be listed by their common or usual names, without additional description.

And remember, choosing ingredients from sources you consider "organic" or "natural" is no guarantee that they are safe. You are still responsible for making sure your ingredients are safe when used according to the labeling, or as they are customarily used, no matter what kinds of ingredients you use.

### 8. Must I test my products and ingredients?

FDA does not have a list of tests required for any particular cosmetic product or ingredient, but you are responsible for ensuring that your product is safe when it is used according to labeled directions, or in the way it is customarily used.

Newcomers to cosmetic manufacture sometimes think that because they have used a product themselves with no apparent problems, or because the ingredients are "natural," "organic," or "botanical," the product must be safe. This assumption is not correct.

### 9. Using available safety data

You can use safety data that's already available on individual ingredients and on products whose formulations are similar to yours. Here are some examples:

- Cosmetic ingredient suppliers often have safety data on their products.

- Safety data may be published in scientific journals (sources include PubMed, at http://www.ncbi.nlm.nih.gov/pubmed, and TOXNET, at http://toxnet.nlm.nih.gov/).

The **Cosmetic Ingredient Review (http://www.cir-safety.org/ingredients)** (CIR) website  has information on the safety of cosmetic ingredients that they have reviewed. (CIR is an industry-funded panel of scientific and medical experts who review the safety of cosmetic ingredients. FDA participates in CIR meetings, but does not vote, and we may agree or disagree with CIR conclusions. However, we do take CIR reviews into consideration when we evaluate cosmetic ingredient safety.)

### 10. Doing additional testing

You may also need to do toxicological testing to fill in any gaps in the information that's available. Toxicology or other testing methods may be necessary to determine the safety of each ingredient and the finished product. Animal testing is not a specific requirement for marketing a cosmetic; however, whatever testing you rely on should be scientifically sound.

As a government agency, FDA does not provide referrals for private testing labs. However, you may find useful resources under "**Trade and Professional Associations of Interest to the Cosmetics Industry (/Cosmetics/ResourcesForYou/Industry/ucm077669.htm)**."

And don't forget microbiological safety. Cosmetics do not have to be sterile, but they must not contain any harmful microorganisms, and the number of aerobic microorganisms per gram must be low. To learn more, see "**Microbiological Methods for Cosmetics (/Food/FoodScienceResearch/LaboratoryMethods/ucm073598.htm)**."

Many factors can affect how your product may become contaminated, including use by consumers, such as dipping one's fingers into a jar. If you do not have the technical expertise to determine the best way to ensure that your product is protected from contamination, you may want to work with a consultant.

For more information on substantiating the safety of cosmetics, see "**Product Testing (/Cosmetics/ScienceResearch/ProductTesting/ucm2005153.htm)**."

### 11. Can I use a Post Office (P.O.) box or website for the address on the label?

A post office box or website address is not adequate for this labeling requirement.

The FD&C Act requires cosmetic labels to identify the name and place of business of the manufacturer, packer, or distributor. By regulation, this includes the street address, city, state, and ZIP code, although you may omit the street address if your firm is listed in a current city or telephone directory. You may use the main place of business instead of the actual place where the cosmetic was manufactured, packed, or distributed, unless such a statement would be misleading.

If you use the distributor's address, you must use a phrase such as "Distributed by" or "Manufactured for," followed by that firm's name and place of business. The name of the firm must be the corporate name. See the regulation on name and place of business at **21 CFR 701.12 (http://www.ecfr.gov/cgi-bin/retrieveECFR?gp=&SID=79073513f7ba6a05126c6da0aa85c460&r=PART&n=21y7.0.1.2.11#21:7.0.1.2.11.3.1.1)**.

### 12. Where can I learn more about labeling requirements?

We can respond to specific labeling questions, but cosmetic labeling is not subject to premarket approval by FDA. It's your responsibility to make sure your labeling meets all requirements.

Here are some useful resources:

- **Cosmetic Labeling and Label Claims (/Cosmetics/Labeling/Claims/ucm2005200.htm)**: An overview to help you get started
- **Cosmetic Labeling Guide (/Cosmetics/Labeling/Regulations/ucm126444.htm)**: For step-by-step help that answers many common questions
- **Cosmetic Labeling Regulations (/Cosmetics/Labeling/Regulations/ucm126440.htm)**: For links to the full text of the regulations that apply to cosmetic labeling

Some cosmetic labeling requirements are regulated by other federal agencies. For example, the **U.S. Federal Trade Commission (http://www.ftc.gov/)** regulates claims of "Made in USA." Other country of origin labeling is regulated by **U.S. Customs and Border Protection (http://www.cbp.gov/)** (see"Chapter 13-Country of Origin Marking").

You may wish to work with a labeling consultant. FDA, as a government agency, does not provide referrals to private consultants. You may, however, find useful resources under "**Trade and Professional Associations of Interest to the Cosmetic Industry (/Cosmetics/ResourcesForYou/Industry/ucm077669.htm)**" and "**Cosmetic Trade Publications (/Cosmetics/ResourcesForYou/Industry/ucm077674.htm)**."

### 13. What local requirements are there for starting a cosmetics business?

You will need to contact your state and local authorities for that information. The **Small Business Administration (http://www.sba.com/)** also can help.

### 14. Do I need to get a license from FDA to manufacture or market cosmetics?

FDA does not license cosmetics firms. However, state or local authorities may require licensing or have other requirements you need to know about. You will need to contact your state or local authorities directly. Again, the **Small Business Administration (http://www.sba.com/)** may be able to help.

### 15. Where can I find more information on FDA requirements I need to know about?

See "**Resources for You: Industry (/Cosmetics/ResourcesForYou/Industry/ucm2005224.htm)**" for a list of resources for members of the cosmetics industry, large and small. You will find information on labeling, color additives, imports, exports, other agencies you need to know about, links to the laws and regulations, and more.

**Subscribe**

FDA/CFSAN Cosmetics Announcements and Recent Additions to the Cosmetics Web Site

Email Address | Subscribe

**Resources for You**

- **"Natural" on Food Labeling (/Food/GuidanceRegulation/GuidanceDocumentsRegulatoryInformation/LabelingNutrition/ucm456090.htm)**
- **Follow FDA Cosmetics on Twitter (https://twitter.com/FDACosmetics)⤢ (/AboutFDA/AboutThisWebsite/WebsitePolicies/Disclaimers/default.htm)**

---

**More in Industry (/Cosmetics/ResourcesForYou/Industry/default.htm)**

---

**Cosmetic Ingredient Suppliers: Fact Sheet (/Cosmetics/ResourcesForYou/Industry/ucm435978.htm)**

---

**Importers & Exporters: Fact Sheet (/Cosmetics/ResourcesForYou/Industry/ucm388732.htm)**

---

**Salon Professionals: Fact Sheet (/Cosmetics/ResourcesForYou/Industry/ucm388738.htm)**

---

**Small Businesses & Homemade Cosmetics: Fact Sheet (/Cosmetics/ResourcesForYou/Industry/ucm388736.htm)**

**Exhibit 7**



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**  Public Health Service

Food and Drug Administration
College Park, MD 20740

March 7, 2013

Mr. Joseph N. Kravec, Jr.
Stember, Feinstein, Doyle, Payne & Kravec
429 Forbes Avenue
Allegheny Building, 17th Floor
Pittsburgh, Pennsylvania 15219

Dear Mr. Kravec:

Reference is made to your letter dated December 14, 2012, requesting that the Food and Drug Administration (FDA) make an administrative determination under 21 CFR 10.25(c) on the meaning of the term "natural" when used in cosmetic labeling governed by the Federal Food, Drug, and Cosmetic Act (FDCA). Your request followed the dismissal by the U.S. District Court for the Northern District of California of your clients' lawsuit, which argued that defendants' use of the word "natural" on the labels of various cosmetic products was false and misleading and which asserted six causes of action under California law. The court dismissed the lawsuit based on its recognition of FDA's primary jurisdiction in regulating the labeling of cosmetics in interstate commerce.

We at FDA appreciate the deference the court showed to agency expertise as demonstrated in its Order Granting Motion to Dismiss. *See Astiana v. Hain Celestial Group, Inc.*, No. C 11-6342 PJH (N.D. Cal. Nov. 19, 2012). While the dismissal of the case by the Northern District of California does not constitute an abeyance of the proceedings or a referral of the matter from the court within the meaning of 21 CFR 10.25(c), we take seriously our responsibility for the regulation of cosmetic safety and labeling, and have carefully considered what would be involved in making a determination on this topic.

Absent a pre-existing regulatory definition, the agency would expect to act in a transparent manner by engaging in a public proceeding to establish the meaning of the term "natural" when used in cosmetic labeling. Transparency in FDA's activities and decision-making allows the public to better understand the agency's decisions, increasing credibility and promoting accountability. It also helps the agency to more effectively protect and promote the public health.

Generally, an agency determination regarding the use of a term such as "natural" would involve promulgating a regulation or issuing formal guidance. FDA regulations provide for public review and comment on proposed regulations and draft Level 1 guidance documents.[1] *See* 21 CFR 10.40(b) and 10.115(g)(1)(ii). FDA may also seek public input prior to the publication of a proposed regulation or draft Level 1 guidance. *See* 21 CFR 10.40(f)(3) and 10.115(g)(1)(i).

---

[1] FDA guidance documents explain the agency's interpretation of, or policy on, a regulatory issue. Level 1 guidance documents set forth the agency's initial interpretations of significant statutory or regulatory requirements, describe substantial changes in FDA's earlier interpretation or policy, or deal with complex scientific or highly controversial issues. *See* 21 CFR 10.115(c)(1). Because FDA has never before interpreted its statutory and regulatory provisions (such as the prohibition on false and misleading cosmetic labeling in FDCA § 602(a)) as they apply to the term "natural" in cosmetic labeling, a guidance document on that topic would be classified as Level 1 guidance.

Page 2 – Mr. Kravec, Jr.

Under limited circumstances, FDA may forego the opportunity for public involvement in enacting a regulation or issuing guidance. Such circumstances may arise in the process of promulgating a regulation when public involvement is "impracticable, unnecessary, or contrary to the public interest," *see* 21 CFR 10.40(e)(1), or in issuing guidance when there are public health reasons for immediate implementation; when a statutory requirement, executive order, or court order requires immediate implementation; or when the guidance document presents a less burdensome policy consistent with public health. *See* 65 FR 56468 at 56472; *see also* 21 CFR 10.115(g)(2) and FDCA § 701(h)(1)(C). None of those circumstances is present here. Given the issues involved in the current request, making the requested determination without adequate public participation would not be in keeping with FDA's commitment to the principles of openness and transparency.

In addition, priority cosmetic public health and safety matters are currently fully occupying the resources that FDA has available for proceedings on cosmetics matters. The source of a cosmetic product's ingredients, whether botanical, animal, mineral, or synthetic, does not determine whether or not it meets the statutory requirement for cosmetic safety. *See* FDCA § 601(a). Consequently, proceedings to define "natural" do not fit within our current health and safety priorities.

Under 21 CFR 701.3(a), all cosmetics must bear a list of ingredients, generally in descending order of predominance. *See* 21 CFR 701.3(a). Such products that do not bear an ingredient declaration in accordance with this requirement are misbranded under the FDCA. *See* Fair Packaging and Labeling Act, 15 U.S.C. § 1456. We note that this requirement might aid consumers who are concerned about the source of a cosmetic product's ingredients.

Based on the foregoing considerations, we respectfully decline to make a determination regarding the term "natural" in cosmetic labeling at this time.

We thank you for the opportunity to respond to this issue, and we hope this information is helpful to you.

Sincerely,

Linda M. Katz, M.D., M.P.H.
Director,
Office of Cosmetics and Colors
Center for Food Safety
 and Applied Nutrition

**Exhibit 8**



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993-0002

January 6, 2014

The Honorable Yvonne Gonzalez Rogers
United States District Court
Northern District of California
1301 Clay St., Suite 400S
Oakland, CA 94612-5212

The Honorable Jeffrey S. White
United States District Court
Northern District of California
450 Golden Gate Avenue, Box 36060
San Francisco, CA 94102-3489

RECEIVED

JAN – 7 2014

LITE DePALMA
GREENBERG, LLC

The Honorable Kevin McNulty
United States District Court
District of New Jersey
Frank R. Lautenberg U.S. Post Office and Courthouse
2 Federal Square
Newark, NJ 07101-0999

Re:     Referrals to the United States Food and Drug Administration in
        *Cox v. Gruma Corp.*, No. 4:12-cv-6502-YGR (N.D. Cal.),
        *Barnes v. Campbell Soup Co.*, No. 3:12-cv-05185-JSW (N.D. Cal.), and
        *In Re General Mills, Inc. Kix Cereal Litigation*, No. 2:12-cv-00249-KM-MCA
        (D.N.J.)

Dear Judges Gonzalez Rogers, White, and McNulty:

This letter responds to your Orders issued on July 11, July 25, and November 1, 2013,
respectively, in the above-referenced cases, which referred the question of whether food products
containing ingredients produced using bioengineered ingredients may be labeled "Natural" or
"All Natural" or "100% Natural" to the Food and Drug Administration ("FDA" or "agency") for
an administrative determination under 21 C.F.R. § 10.25(c). In those cases, the plaintiffs allege
that the "Natural," "All Natural," and/or "100% Natural" labeling on the Defendants' products
are misleading because the products contain corn grown from bioengineered, genetically
modified seeds. The *Cox* and *Barnes* cases were stayed for six months with the potential for a
further extension; the *Kix Cereal Litigation* was administratively terminated pending FDA's
response to the referrals.

FDA has not promulgated a formal definition of the term "natural" with respect to foods. The agency has, however, stated that its policy regarding the use of the term "natural" on food labeling means that "nothing artificial or synthetic (including all color additives regardless of source) has been included in, or has been added to, a food that would not normally be expected to be in the food." *See* 58 Fed. Reg. 2302, 2407 (1993).

If FDA were inclined to revoke, amend, or add to this policy, we would likely embark on a public process, such as issuing a regulation or formal guidance, in order to determine whether to make such a change; we would not do so in the context of litigation between private parties. Issuance of a regulation or guidance document allows an agency to obtain data, information, and views from all stakeholders wishing to engage on an issue. Here, given the complexities of the current request, including the competing concerns among and between stakeholders (e.g., various consumer organizations, diverse industry segments), it would be prudent and consistent with FDA's commitment to the principles of openness and transparency to engage the public on this issue.

We note that defining the term "natural" on food labeling necessarily involves interests of Federal agencies other than FDA, including the United States Department of Agriculture ("USDA"), as well as competing views on the part of stakeholders. FDA has discussed the complexities of such a definition with USDA and both agencies have been considering the issue. Any definition of "natural" on food labeling has implications well beyond the narrow scope of genetically engineered food ingredients about which the Court's referral pertains. For example, if the agencies were to define the term, they would likely need to consider among other things: relevant science; consumer preferences, perceptions, and beliefs; the vast array of modern food production technologies in addition to genetic engineering (e.g., use of different types of fertilizer, growth promotion drugs, animal husbandry methods); the myriad food processing methods (e.g., nanotechnology, thermal technologies, pasteurization, irradiation); and any strictures flowing from the First Amendment. Thus, even if we were to embark on a public process to define "natural" in the context of food labeling, there is no assurance that we would revoke, amend, or add to the current policy, or develop any definition at all.[1]

At present, priority food public health and safety matters are largely occupying the limited resources that FDA has to address foods matters. These matters include developing food safety regulations that implement the FDA Food Safety Modernization Act of 2011, many of which have statutory and/or court-ordered deadlines; issuing nutrition labeling regulations, including regulations that implement the Patient Protection and Affordable Care Act of 2010; other actions with direct public health impact (such as addressing the legal status of partially hydrogenated oils); and numerous other matters, such as responding to outbreaks of food-borne illness and overseeing the safety of imported foods. Because, especially in the foods arena, FDA operates in a world of limited resources, we necessarily must prioritize which issues to address.

---

[1] FDA was notified by letter dated December 5, 2013, that the Grocery Manufacturers Association ("GMA") intends to file a citizen petition early in 2014 asking FDA to "issue a regulation authorizing foods containing ingredients derived from biotechnology to be labeled 'natural.'" For all of the reasons set forth previously, we believe that, if the agency were to decide to examine this policy question, the public would be better served if the agency used its administrative processes, rather than providing a response in the context of private litigation on the issue.

Based on the foregoing considerations, we respectfully decline to make a determination at this time regarding whether and under what circumstances food products containing ingredients produced using genetically engineered ingredients may or may not be labeled "natural."

Sincerely,

Leslie Kux
Assistant Commissioner for Policy

cc:   The Honorable Madeline Cox Arleo
      United States District Court for the District of New Jersey
      Martin Luther King Building & U.S. Courthouse
      50 Walnut Street Room 4015
      Newark, NJ 07101

      Benjamin M. Lopatin, Esq. (Counsel for Plaintiffs Cox and Barnes)
      The Law Offices of Howard W. Rubinstein, P.A.
      One Embarcadero, Suite 500
      San Francisco, CA 94111

      Bruce Daniel Greenberg, Esq. (Counsel for Plaintiffs in *In Re General Mills, Inc. Kix
         Cereal Litigation*)
      Lite DePalma Greenberg, LLC
      Two Gateway Center, 12th Floor
      Newark, NJ 07102

      Gregory Huffman, Esq. (Counsel for Gruma Corp.)
      Thompson & Knight LLP
      One Arts Plaza
      1722 Routh Street, Suite 1500
      Dallas, TX 75201

      William L. Stern, Esq.  (Counsel for Campbell Soup Co.)
      Lisa Ann Wongchenko, Esq.
      Morrison & Foerster LLP
      425 Market Street
      San Francisco, CA 94105

      David C. Kistler, Esq. (Counsel for General Mills, Inc.)
      Rachel Jane Gallagher, Esq.
      Stephen M. Orlofsky, Esq.
      Blank Rome, LLP
      301 Carnegie Center, 3rd Floor
      Princeton, NJ 08540